24-2535-cv
*Chapdelaine v. Desjardin*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

August Term 2025

(Argued: October 30, 2025      Decided: July 2, 2026)

Docket No. 24-2535-cv

———————————

DARLENE CHAPDELAINE,

*Plaintiff-Appellant*,

*v.*

ROBERT L. DESJARDIN, JASON N. DEOJAY,

*Defendants-Appellees*,

JOHN GREGORZEK, JOHN AIELLO, DEPARTMENT OF EMERGENCY SERVICES AND
PUBLIC PROTECTION, CONNECTICUT STATE, JAMES ROVELLA, COMMISSIONER,

*Defendants*.

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

———————————

Before:          CHIN, LEE, and ROBINSON, *Circuit Judges*.

———————————

Appeal from pre- and post-trial decisions of the United States

District Court for the District of Connecticut (Shea, *J.*), partially granting

summary judgment, excluding evidence, and denying post-verdict judgment as a matter of law following a jury's finding that plaintiff-appellant's arrest did not violate state or federal law. The district court dismissed plaintiff-appellant's claims for malicious prosecution due to the lack of a favorable termination of the underlying criminal case, excluded from evidence the disciplinary record of one of the defendant state troopers, and upheld the jury's verdict rejecting plaintiff-appellant's excessive force claims. We find no error or abuse of discretion in any of the decisions, and accordingly we affirm.

AFFIRMED.

---

DARLENE A. CHAPDELAINE, *pro se*, Dayville, CT.

SAMANTHA C. WONG, Assistant Attorney General, *for* William Tong, Attorney General of Connecticut, Hartford, CT, *for Defendants-Appellees*.

---

CHIN, *Circuit Judge*:

On Thanksgiving Day 2018, defendants-appellees Robert L. Desjardin and Jason N. Deojay, both Connecticut State Troopers, arrested plaintiff-appellant Darlene Chapdelaine for assault of an elderly victim, disorderly conduct, and interfering with and resisting arrest. While the charges

- 2 -

were still pending, Chapdelaine sued Desjardin, Deojay, and others for, among other things, malicious prosecution and use of excessive force. Five years after the arrest, Chapdelaine's resulting state criminal charges were dismissed in exchange for her completion of a one-day diversionary program.

As relevant here, the district court granted summary judgment dismissing the malicious prosecution claims after concluding that Chapdelaine's completion of a diversionary program in exchange for the dismissal of her state criminal charges was not a favorable termination for purposes of a constitutional malicious prosecution claim. The excessive force claims against Desjardin and Deojay proceeded to trial before a jury, and the district court excluded evidence relating to Desjardin's discipline for his actions during Chapdelaine's arrest. The jury found in Desjardin and Deojay's favor. Accordingly, the district court entered judgment dismissing Chapdelaine's claims and thereafter denied her post-judgment motions for relief.

On appeal, Chapdelaine, proceeding *pro se*, contends that the district court erred by concluding that: (1) the dismissal of her state criminal charges was not a favorable termination for the purposes of a malicious prosecution claim; (2) the evidence of Desjardin's discipline was not admissible; and (3) the jury's

verdict was supported by the evidence at trial. For the reasons stated below, we AFFIRM each of the district court's decisions.

## BACKGROUND

### I. *The Facts*

As Chapdelaine appeals from three different decisions of the district court, we organize our recitation of the facts as follows: (1) the arrest; (2) the state court criminal proceedings; and (3) the internal affairs report relating to Desjardin's actions.[1]

#### A. *The Arrest*

The facts in this section are drawn from the trial evidence and other relevant materials in the record, and we construe them in the light most favorable to Desjardin and Deojay as the prevailing parties at trial. *See Ortiz v. Stambach*, 137 F.4th 48, 56 n.1 (2d Cir. 2025).

In 2018, Chapdelaine and then-75-year-old Bruce Serwecki resided together at Chapdelaine's home in Dayville, Connecticut. Serwecki had been friends with Chapdelaine's father, and after his wife's death he moved in with

---

[1] Chapdelaine, proceeding *in forma pauperis*, attached only the docket sheet as the appendix. Accordingly, we cite to the relevant district court docket where necessary. *See* 2d Cir. Local. R. 30.1(e)(1).

Chapdelaine.  On the morning of November 22, 2018, Shannon Demello, Serwecki's granddaughter, was at Chapdelaine's home for Thanksgiving with Chapdelaine and Serwecki.  Later that morning, however, Demello called 911 and reported that an intoxicated Chapdelaine yelled at Serwecki, "push[ed] him onto the floor," and "punch[ed] him" multiple times.  Dist. Ct. Dkt. 56-2, Ex. A, at 3.

In response to the call, at 10:28 AM, the 911 dispatcher sent Desjardin and Deojay to Chapdelaine's home.  The dispatcher informed Desjardin and Deojay that Serwecki was intoxicated and was arguing with Chapdelaine, who was "pushing him down," but that there were no weapons involved.  Dist. Ct. Dkt. 56-2 at 8.

Desjardin's and Deojay's vehicles were equipped with motor video recorders ("MVRs").  Deojay's MVR was activated en route to Chapdelaine's home and captured the following:  At 10:36 AM, Deojay turned onto Chapdelaine's property and stopped his vehicle on the left side of the driveway facing the garage.  There were two parked vehicles -- a car and a truck -- in the driveway.  Demello was seated in the driver's seat of the truck.  On the left of the car and truck, Chapdelaine was walking around holding out a cell phone,

- 5 -

Serwecki was standing near the front of the car, and a small dog was running loose near the two of them. A few seconds after arriving, Deojay and Desjardin walked up the driveway, and Chapdelaine and Serwecki both approached the state troopers. The MVR audio is not clear as Chapdelaine and Serwecki were speaking over each other, but Serwecki stated multiple times that he wished to leave Chapdelaine's home.

Shortly thereafter, Chapdelaine asked Dejardin if he could please grab the loose dog. Desjardin responded, "No, you can grab her, it's your fucking dog, you grab her." Ex. 84, 10:36:44-10:36:50. Chapdelaine then asked Desjardin to repeat himself and informed him that she was recording. Desjardin subsequently shifted closer to Serwecki, and Chapdelaine moved out of view of the MVR. After Desjardin again instructed Chapdelaine to retrieve her own dog, Chapdelaine responded, "You're real fucking nice." *Id.* at 10:36:54-10:37:00. Desjardin then asked Chapdelaine whether she was handicapped, and after she responded "yes," Desjardin replied, "Good, grab the dog yourself." *Id.* at 10:37-10:37:09. Chapdelaine then explained that she had recently undergone major back surgery, loudly asked Desjardin for his name, and asked whether he cared that she had had major back surgery. Desjardin responded that he did not care

and asked Chapdelaine to stop interrupting while they were trying to interview Serwecki.

At 10:37:25 on the MVR, Desjardin walked out of the MVR's view towards Chapdelaine, and as he approached her, Desjardin said, "Get this camera out of my face." *Id.* at 10:37:25-10:37:27. Deojay then also walked out of sight of the MVR toward Desjardin and Chapdelaine. For the next minute, Chapdelaine cried out for help and repeatedly stated she had "just had major back surgery" while Desjardin and Deojay repeatedly told her to stop resisting. *Id.* at 10:37:28-10:38:28.

Between 10:37 and 10:38 AM, right after Desjardin and Deojay left sight of the MVR and told Chapdelaine to be quiet, Chapdelaine "charged at [Desjardin]. . . aggressively with her cell phone up in her hand." Dist. Ct. Dkt. 208 at 174; *see also id.* at 180. Desjardin was concerned because he smelled alcohol on Chapdelaine's breath and because he was aware that she had previously been arrested for threatening to shoot someone. Therefore, Desjardin took two or three small steps forward, raised his hand, and smacked Chapdelaine's hand and phone away. He then grabbed Chapdelaine's hand and tried to get it behind her, but Chapdelaine resisted and "let herself fall to the ground." *Id.* at 182. Once

Chapdelaine was on the ground, Desjardin managed to handcuff her right hand but could not secure her left hand, as she resisted and placed it under her body. Desjardin attempted to gain control of Chapdelaine's left hand by placing his knee on her right arm. With help from Deojay, Desjardin eventually handcuffed Chapdelaine and sat her upright, and then the two officers placed their hands under Chapdelaine's armpits and lifted her to a standing position.[2]

Desjardin and Deojay then escorted a handcuffed Chapdelaine back into the MVR's view, walking her in front of Deojay's vehicle and down the driveway to Desjardin's vehicle. After placing Chapdelaine in Desjardin's vehicle, Deojay returned to the driveway and began speaking with Demello. Demello reported that Chapdelaine and Serwecki had been arguing since they had picked Demello up that morning; after they arrived at Chapdelaine's home,

_____

[2]    Chapdelaine also testified at trial and provided a significantly different description of her arrest. As explained further below, however, for purposes of this appeal, we do not consider Chapdelaine's testimony to the extent it is inconsistent with the jury's findings. Additionally, Desjardin testified that Chapdelaine's screams during her arrest were inconsistent with what was happening, as "she was screaming and then getting louder and [he and Deojay] weren't even applying any force to her or even touching her at some points." Dist. Ct. Dkt. 208 at 182. Desjardin described Chapdelaine's screams as "being theatrical for the cameras." *Id.* at 183. Desjardin also testified that the lack of the use of force was evidenced by the fact that Chapdelaine's glasses remained on her face during the incident. The jury apparently accepted his testimony and not hers.

things turned violent. Demello stated that Serwecki wanted to leave, but Chapdelaine blocked the truck in the driveway, took Demello's phone, and "kept pushing [Serwecki] and punching [Serwecki]." Ex. 84, 10:40:24-10:40:34. Deojay instructed Demello to stay warm in the car and instructed Serwecki to follow him so that he could take Serwecki's statement in his car.

At 10:42:57 AM, Deojay and Serwecki cannot be seen on the MVR, but Serwecki can be heard giving his statement. Serwecki reported that on the way back from picking up Demello, Chapdelaine wanted to stop for cocktails, and the two argued after Serwecki stated that "we don't need a cocktail." *Id.* at 10:43:30-10:43:55. Deojay then interrupted and asked Serwecki if he wanted medical services for his hands, which had blood or scratches on them, and Serwecki declined. Serwecki next reported that on the way home from picking up Demello, they stopped for drinks, he and Chapdelaine argued again after he called her an alcoholic, and the two continued arguing after a designated driver dropped them off at home. Deojay interrupted and asked Serwecki, "[Chapdelaine] pushed you down?" *Id.* 10:57:07-10:57:12. Serwecki responded, "Oh, yeah." *Id.* Deojay also asked Serwecki if Chapdelaine had slapped him, and he responded, "No, just knocked me down . . . that's how I got this here,"

- 9 -

referring, apparently, to the injury on his hands. *Id.* at 10:57:20-10:57:30. Deojay concluded by repeating a summary of the statement back to Serwecki, and Serwecki confirmed its accuracy.

Desjardin's MVR was deactivated prior to reaching Chapdelaine's driveway and did not capture any of the events before Chapdelaine was placed in his vehicle. Desjardin's MVR was not reactivated until 10:39:34 AM, when Chapdelaine was already in handcuffs inside Desjardin's vehicle. Once the MVR was reactivated, Desjardin repositioned it so that it captured the inside of the vehicle. At 10:41:35 AM, after calling Chapdelaine a "drunk," Desjardin drove away with Chapdelaine in the passenger seat of his vehicle. *Id.* at 10:40:50–10:40:54. At 10:48:20 AM, Desjardin and Chapdelaine arrived at Troop D, a Connecticut State Police building, where she was removed from Desjardin's vehicle and taken inside the building with the assistance of another state trooper.

## B. *State Court Proceedings*

The facts in this section are drawn from the parties' summary judgment submissions and other relevant materials in the record and construed in the light most favorable to Chapdelaine as the party against whom summary

judgment was granted. *Roth v. Armistice Cap., LLC,* 151 F.4th 21, 24 n.1 (2d Cir. 2025).

On November 22, 2018, Chapdelaine was charged with "Interfering/Resisting Arrest in violation of Connecticut General Statute § 53-167a, Assault in the third degree of an elderly victim in violation of Connecticut General Statute § 53a-61a, and Disorderly Conduct in violation of Connecticut General Statute § 53a-182." Dist. Ct. Dkt. 56-8, ¶ 33; *see also* Dist. Ct. Dkt. 56-3, Ex. B, at 1. Chapdelaine posted a $1,500 bond and was released the same day.

On November 27, 2018, after trying to speak with someone from Troop D several times, Serwecki recanted his original report that Chapdelaine pushed him. Serwecki's new statement provided the following: "I stated that she had pushed me to the ground because I was trying to leave[;] that was a lie. I fell to the ground multiple times because I was drunk[,] not because I was pushed. I sustained the injuries to my hands and rear end from fa[l]ling." Dist. Ct. Dkt. 56-3, Ex. B. at 8.

Demello testified at her deposition that, on November 22 or 23, 2018, Serwecki contacted her on behalf of Chapdelaine and asked that she recant her

statement regarding the events of November 22, 2018.[3]  Because Serwecki

recanted his statement and Chapdelaine attempted to have Demello recant her

statement, Chapdelaine was charged with felony tampering with a witness in

violation of Connecticut General Statutes § 53a-151.

The criminal charges against Chapdelaine remained pending for

nearly five years.  During those five years, Chapdelaine remained out of custody

on bond, received mental health treatment on her own, and was not arrested on

any new charges.

On October 25, 2023, counsel for Chapdelaine and a Connecticut

State Attorney appeared before Superior Court Judge Kevin M. Shay in

Danielson, Connecticut.  The parties had previously engaged in off-the-record

discussions with Judge Shay regarding a resolution of the criminal charges.  At

the October 25 on-the-record conference, Judge Shay noted that he had reviewed

Chapdelaine's prior application for a supervised diversionary program.  Judge

Shay explained that a previous judge had denied the application because there

was a mandatory minimum sentence attached to Chapdelaine's charge of third-

degree assault on an elderly person, which the previous judge believed made

---

[3]     Serwecki testified at his deposition, however, that he had not spoken to Demello
since the incident.

- 12 -

Chapdelaine ineligible for the program. Judge Shay concluded, however, based on the five-year pendency of the case, Chapdelaine's proactive steps during that time to pursue appropriate treatment, and his own interpretation of Connecticut state law, that Chapdelaine was eligible for the supervised diversionary program and that a resolution through the program would be appropriate.

Chapdelaine agreed to renewing her application to the program. The Connecticut State's Attorney's office, however, noted its objection to Chapdelaine being reconsidered for the program. Ultimately, Judge Shay ordered the parties to coordinate with the Office of Adult Probation so that Chapdelaine could complete a one-day diversionary program in exchange for the dismissal of the criminal charges.

On October 26, 2023, the parties reappeared before Judge Shay. Judge Shay noted that he received a report from Probation confirming that Chapdelaine completed her one-day program. Accordingly, he dismissed the charges against her.

C. *Internal Affairs Report*

The facts in this section are not disputed. On November 22, 2018, the same date as her arrest, Chapdelaine filed a civilian complaint against

Desjardin for his actions during her arrest and transport to the Troop D building. Chapdelaine's complaint prompted an internal affairs investigation into Desjardin's conduct. The investigation evaluated whether sufficient evidence existed, under a preponderance of the evidence standard, to recommend sustaining four violations of the "Administrative and Operations Manual." Dist. Ct. Dkt. 63-2 at 8-9. The potential violations were: (1) use of excessive force; (2) failure to follow MVR recording guidelines; (3) failure to render timely medical aid; and (4) failure to display proper attitude and demeanor.

On November 20, 2019, the investigator submitted his findings and recommendations. The investigator recommended that violation one be "not sustained" after finding there was "insufficient evidence to clearly prove or disprove" the use of excessive force. Dist. Ct. Dkt. 63-3 at 1, 6. The investigator recommended that violation two, however, be sustained after finding that Desjardin's MVR was working and should have been activated prior to Chapdelaine's arrest. The investigator also recommended that violation three be sustained because Desjardin should have rendered medical aid to Chapdelaine at her residence or upon arrival to Troop D and failed to do so. Finally, the investigator recommended that violation four be sustained after finding that

Desjardin's comments and behavior while dealing with Chapdelaine were unprofessional. The investigation's recommendations were accepted, and -- as reflected in a 75-page report of the internal affairs investigation -- charge one was not sustained but charges two, three, and four were sustained by the reviewing officer.

## II. *Procedural History*

On June 4, 2020, Chapdelaine filed her original complaint asserting twenty-three causes of action against various defendants. After defendants moved to dismiss the complaint, Chapdelaine filed an amended complaint on September 24, 2020, again asserting twenty-three causes of action. On October 22, 2020, defendants moved to dismiss and/or strike the amended complaint.

On September 22, 2021, in a text order, the district court denied defendants' motion to strike and granted in part and denied in part defendants' motion to dismiss. As relevant here, the district court denied the motion to dismiss Chapdelaine's individual-capacity claims pursuant to 42 U.S.C. § 1983

- 15 -

against Desjardin and Deojay for false arrest, false imprisonment, malicious prosecution, and excessive force, as well as several Connecticut state law claims.[4]

A.    *Summary Judgment*

1.    *The Initial Rulings and Stay of the Matter*

On December 8, 2021, Desjardin and Deojay moved for summary judgment on the remaining claims. On September 23, 2022, the district court granted in part and denied in part the motion for summary judgment and directed the clerk of court to administratively close but not dismiss the case.

With respect to the federal claims for false arrest, false imprisonment, and malicious prosecution, the district court held that because Chapdelaine's criminal charges were still pending, she could not meet the requisite favorable termination element of those claims, which were consequently not cognizable at that time. The district court also held that, even if Chapdelaine could show favorable termination, Desjardin and Deojay had at least arguable probable cause to arrest her. Therefore, the district court concluded that Desjardin and Deojay were entitled to summary judgment on the

---

[4]    Certain of Chapdelaine's claims, including claims against other defendants, were withdrawn or dismissed, either before or at the conclusion of trial. Chapdelaine does not challenge the dismissal of those other claims.

false arrest and false imprisonment claims and dismissed those claims with prejudice.

With respect to the malicious prosecution claims, the district court concluded there were genuine issues of material fact regarding the basis of Chapdelaine's arrest and prosecution for disorderly conduct and interfering with an officer. As noted above, however, Chapdelaine could not pursue her malicious prosecution claims arising from these state criminal charges until they were terminated in her favor. Accordingly, the district court dismissed the malicious prosecution claims without prejudice to refile.

The district court denied summary judgment on the excessive force claims against Desjardin and Deojay. The district court concluded that, viewing the facts in the light most favorable to Chapdelaine, a reasonable jury could find that Desjardin's conduct amounted to excessive force and that Deojay failed to intervene. But because the state criminal proceedings were still pending, invoking *Younger v. Harris*, 401 U.S. 37 (1971), the district court stayed Chapdelaine's federal claim for excessive force.

The district court declined to dismiss Chapdelaine's state law claims on jurisdictional grounds, as requested by defendants, because the federal

excessive force claim was still a live issue to be adjudicated later. Because the district court stayed the excessive force claim, it administratively closed the matter and ordered Chapdelaine "to file a notice within 30 days of the final adjudication of her underlying state criminal charges setting forth the disposition of each charge." Dist. Ct. Dkt. 72 at 27-28.

### 2. *Lift of the Stay and Renewed Malicious Prosecution Claims*

On October 29, 2023, Chapdelaine filed a notice of request to reopen the case and reassert her malicious prosecution claims. The notice informed the district court that all the state criminal charges against Chapdelaine were dismissed and that they did not result in a conviction. Lastly, the notice also included a request to add a deliberate indifference claim against all defendants.

On October 30, 2023, the district court, in a text order, notified Chapdelaine that her notice to reopen failed to provide the details necessary for the court to address her request. The text order posed the following questions to Chapdelaine:

> Were the charges dismissed because (1) the Plaintiff won an acquittal on all charges after trial, (2) the State moved to dismiss the charges, (3) the Plaintiff completed the state court's Accelerated Rehabilitation Program or another similar program, or (4) some other reason or circumstance warranted dismissal of the charges?

Dist. Ct. Dkt. 74.

On November 2, 2023, Chapdelaine filed a new notice of request to reopen, asking for the same relief as in her previous notice. This notice, however, provided more details that answered the district court's questions and attached transcript excerpts from the relevant state court proceedings. More specifically, the updated notice reported that Chapdelaine's state court charges were dismissed after she completed a court-ordered one-day supervised diversionary program.

On November 9, 2023, defendants responded to Chapdelaine's notice of request to reopen. Defendants acknowledged that the Superior Court dismissed the charges upon Chapdelaine's completion of the one-day program. Defendants' response also objected to Chapdelaine's request to amend and/or add a deliberate indifference claim.

On November 13, 2023, the district court, in a text order, made several rulings. As relevant here, first, the district court directed the clerk of the court to reopen the matter. Second, without motion from the defendants, the district court "dismisse[d] the plaintiff's malicious prosecution claim with prejudice for the reasons set forth in its summary judgment ruling" and

concluded that, under Second Circuit law, Chapdelaine's completion of the supervised diversionary program did not amount to a "favorable termination." Dist. Ct. Dkt. 77. Third, the district court denied Chapdelaine's request to amend her complaint due to delay and prejudice to the defendants. Fourth, the district court set the case for trial on Chapdelaine's excessive force and state law claims.

### B. *Motion in Limine*

During pretrial proceedings, Chapdelaine proposed as a trial exhibit (plaintiff's exhibit 33) a memorandum reporting the disciplinary history of five individual defendants, including Desjardin and Deojay.[5] In relevant part, the memorandum noted that Desjardin had been suspended for use of force and that he was the subject of an internal affairs investigation. On June 7, 2024, defendants filed a motion *in limine* to exclude the memorandum as well as the underlying internal affairs report regarding Desjardin's conduct toward Chapdelaine during her arrest.[6] Defendants argued that the memorandum and

---

[5] On May 15, 2024, just prior to the motion *in limine* and after multiple attempts to withdraw as counsel, the district court granted then-plaintiff counsel's motion to withdraw. Since then, Chapdelaine has proceeded *pro se*. During the trial, however, Chapdelaine testified that she had recently graduated law school, passed the bar exam, and her license to practice was pending.

[6] The underlying report does not support the suggestion in Chapdelaine's proposed exhibit 33 that Desjardin was suspended for use of force in connection with

report were inadmissible hearsay, and any testimony regarding Desjardin's discipline was also prohibited by Federal Rule of Evidence 404(b). Chapdelaine filed two responses arguing that the document setting forth defendants' disciplinary history and Desjardin's internal affairs report were admissible under the hearsay exceptions for public records or records maintained in the ordinary course of business.

On June 25, 2024, the district court heard oral argument on the parties' motions *in limine*. In relevant part, the district court agreed with Chapdelaine that the documents concerning Desjardin's internal affairs report and its findings were potentially admissible despite a hearsay objection on the basis that they were public reports and business records. Nevertheless, the district court concluded that most of the report's findings should be excluded under Federal Rule of Evidence 403 because they posed too great a risk of confusing the jury and misleading the jury to believe that Desjardin's violations of police regulations automatically amounted to excessive force in violation of the Fourth Amendment. The district court ruled that the internal affairs report's finding that Desjardin failed to reactivate his MVR before reaching Chapdelaine's

---

her arrest. The record is unclear as to whether Desjardin was indeed suspended and, if so, for how long.

- 21 -

home was likely the only finding that would survive a Rule 403 objection. Consequently, as relevant here, the district court granted in part defendants' motion *in limine* by excluding the memorandum noting Desjardin's suspension and excluding the findings portion of the internal affairs report, except with respect to the MVR finding or to the extent a portion of the report was admissible for impeachment purposes.

C. *Trial*

Trial before a jury commenced on July 10, 2024. The trial lasted five days, ten witnesses testified, and fifty-two exhibits were received into evidence. The following claims were presented to the jury: (1) excessive force in violation of the Fourth Amendment; (2) violation of Chapdelaine's First Amendment right to record; (3) First Amendment retaliation; (4) assault and battery; (5) intentional infliction of emotional distress; and (6) abuse of the civil protective order process.

After the parties rested, each side moved for judgment as a matter of law. Desjardin and Deojay moved for judgment as a matter of law on all of Chapdelaine's claims. The district court reserved ruling on their motions. Chapdelaine moved for judgment as a matter of law on her excessive force claims. The district court also reserved ruling on Chapdelaine's motion and

asked if she wished to make a motion regarding any other claims. Chapdelaine declined.

The jury found in favor of Desjardin and Deojay on all claims. On July 22, 2024, judgment was entered in favor of Desjardin and Deojay.

On July 19, 2024, Chapdelaine filed a post-verdict motion for judgment as a matter of law and/or a motion for a new trial and/or a motion to alter or amend the judgment. On September 23, 2024, in a text order, the district court denied Chapdelaine's pre- and post-verdict motions for judgment as a matter of law. The district court reasoned that "[t]his case was essentially a credibility contest, [] it was uniquely the jury's province to decide the winner of that contest," and the district court could not "substitute its own views about the credibility of the witnesses for those of the jury." Dist. Ct. Dkt. 203. The district court also denied Chapdelaine's motion for a new trial, as she did not appear to challenge the district court's evidentiary rulings or the jury instructions, and the jury verdict was not "a seriously erroneous result or a miscarriage of justice." *Id.* Lastly, the district court denied Chapdelaine's motion to amend or alter the judgment because Chapdelaine failed to "set forth any controlling or factual

matters that the Court overlooked or any intervening change of law or new, admissible evidence." *Id.*

This appeal followed.

## *DISCUSSION*

Chapdelaine challenges (1) the district court's grant of summary judgment dismissing her malicious prosecution claims, (2) the exclusion of evidence relating to the discipline of Desjardin, and (3) the sufficiency of the evidence at trial. We address each issue in turn.

## I. *Summary Judgment*

First, Chapdelaine appeals the dismissal of her Fourth Amendment malicious prosecution claims.[7]

### A. *Standard of Review*

The district court granted summary judgment dismissing the malicious prosecution claims without prejudice because Chapdelaine could not show favorable termination while the state criminal charges were pending. After

---

[7] Desjardin and Deojay argue on appeal that Chapdelaine actually asserts state law claims for malicious prosecution. We reject that argument. Chapdelaine argues she proved favorable termination under *Thompson*, which Desjardin and Deojay agree applies only to federal malicious prosecution claims. Moreover, the district court analyzed the claims below under Section 1983 and the Fourth Amendment.

the state criminal charges were dismissed, Chapdelaine moved to reassert her claims. While defendants responded, they did not formally move for summary judgment again. In a text order, the district court dismissed Chapdelaine's malicious prosecution claims with prejudice "for the reasons set forth in its summary judgment ruling and because . . . completion of a diversionary program followed by a dismissal . . . is not a favorable termination." Dist. Ct. Dkt. 77 (citation modified).

A court may grant summary judgment and dismiss claims under Federal Rule of Civil Procedure 56(f) *sua sponte*, meaning on its own initiative without a motion, under certain conditions. *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015). The district court seemingly granted summary judgment here with notice to the parties and on grounds previously raised by the defendants. Hence, whether the district court's text order was an extension of its prior summary judgment ruling or was instead a separate, new *sua sponte* grant of summary judgment is a question we need not decide, as both are dismissals under Rule 56 and subject to the same standard of review. *See id.* (explaining that *de novo* standard would apply to *sua sponte* grant of summary judgment); *Alberty v. Hunter*, 144 F.4th 408, 414 (2d Cir. 2025) (reviewing *de novo* routine

- 25 -

grant of summary judgment).  Accordingly, we review the grant of summary

judgment and dismissal of Chapdelaine's malicious prosecution claims *de novo*,

construing the evidence in the light most favorable to Chapdelaine as the non-

movant.  *Hunter*, 144 F.4th at 414.  Summary judgment is appropriate where

"there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a).

**B.**     ***Applicable Law***

To prevail on a Section 1983 claim against a state actor for malicious

prosecution, a plaintiff must establish the elements of a malicious prosecution

claim under the relevant state law.  *Hunter*, 144 F.4th at 417.  "A plaintiff in an

action alleging malicious prosecution under Connecticut law must show (1) the

defendant initiated or continued criminal proceedings against the plaintiff,

(2) the criminal proceeding terminated in favor of the plaintiff, (3) the defendant

acted without probable cause, and (4) the defendant acted with malice."  *Id.*

(citation modified).  The parties do not dispute the first element, that is, that

criminal charges were initiated and continued against Chapdelaine.

The parties do, however, dispute the second element, that is,

whether the criminal proceedings terminated in Chapdelaine's favor.  The

favorable termination requirement of a Fourth Amendment claim for malicious

prosecution serves multiple purposes, including:

> (i) [] avoid[ing] parallel litigation in civil and criminal proceedings over the issues of probable cause and guilt; (ii) [] preclud[ing] inconsistent civil and criminal judgments where a claimant could succeed in the tort action after having been convicted in the criminal case; and (iii) [] prevent[ing] civil suits from being improperly used as collateral attacks on criminal proceedings.

*Thompson v. Clark*, 596 U.S. 36, 44 (2022).

In *Thompson*, the Supreme Court resolved a circuit split over

whether the favorable termination element of a Fourth Amendment malicious

prosecution claim requires a plaintiff to show some affirmative indication of

innocence or only that the prosecution ended without a conviction. *Id.* at 41. The

Court held that "[a] plaintiff need only show that the criminal prosecution ended

without a conviction." *Id.* at 49. The Court explained that requiring an

affirmative indication of innocence would "make little sense" as it would

"paradoxically foreclose a § 1983 claim when the government's case was weaker

and dismissed without explanation before trial, but allow a claim when the

government's evidence was substantial enough to proceed to trial." *Id.* at 48.

While *Thompson* clarified that courts may no longer require a

showing of affirmative innocence, post-*Thompson* decisions make apparent that

*Thompson*'s resolution of the circuit split should not be interpreted overbroadly to mean *all* prosecutions that end without a conviction amount to a favorable termination. Indeed, in *Carruthers v. Colton*, we applied *Thompson* in the context of a plea bargain where some of the charges were dismissed without a conviction. 153 F.4th 169, 174 (2d Cir. 2025). We recognized that a plaintiff could show favorable termination in multiple ways, including if "the prosecutor abandoned the criminal case or the court dismissed the case without providing a reason." *Id.* at 186 (citing *Thompson* 596 U.S. at 45.). We held, however, that unlike in *Thompson*, where charges were dismissed without any explanation from the prosecution or the court as to why the charges were being dismissed, the favorable termination element is not satisfied where charges are dismissed as the result of a calculated decision based on a compromise. *Id.* at 186-87. After all, a negotiated guilty plea (for example) "ostensibly provides an explanation for why charges were dismissed." *Id.* at 186. Thus, while some charges in *Carruthers* did not end in a conviction, that was the result of a bargaining process where more serious charges were dismissed in return for a guilty plea to a minor charge. *Id.* at 187.

- 28 -

C.  *Application*

Chapdelaine argues that, under *Thompson*, her participation in a one-day supervised diversionary program amounts to a favorable termination and does not bar her malicious prosecution claims.  We disagree.

The underlying state criminal matter was pending against Chapdelaine for nearly five years and the court's dismissal of the charges following her completion of a one-day diversionary program reflects a court-ordered compromise.  The Connecticut Superior Court judge explained on the record that -- based on the five-year length of the case without resolution and Chapdelaine's efforts to attend mental health treatment during the pendency of the case -- the criminal charges would be dismissed contingent upon Chapdelaine's agreement to and completion of a one-day supervised diversionary program.  She indeed agreed to the compromise and completed the program.  Under these circumstances, the dismissal of Chapdelaine's criminal charges was not a favorable termination for purposes of a malicious prosecution claim.  *See Carruthers*, 153 F.4th at 185-88 (explaining that proceedings ending in a compromise, and in particular plea dispositions, do not satisfy the favorable termination element).

While *Carruthers* dealt with favorable termination in the context of a guilty plea, its reasoning applies to these facts. Here, the prosecution did not abandon the case; instead, the charges were resolved through a court-ordered compromise, and the trial court provided a detailed explanation for the dismissal of the criminal charges. While *Carruthers* is arguably distinguishable because Chapdelaine did not plead guilty to any count, as in *Carruthers*, here there was a compromise that resulted in the calculated dismissal of charges in return for Chapdelaine's successful participation in a diversionary program. *Cf. Carruthers*, 153 F.4th at 185-88. It would make little sense to permit a plaintiff who agreed to a compromise, in return for the dismissal of charges, to then bring a lawsuit against the state actors claiming favorable termination. Such a result would also undermine the purposes of the favorable termination element, which include preventing parallel litigation in civil and criminal proceedings over the issue of guilt and the use of civil lawsuits as collateral attacks on criminal proceedings. *See Thompson* 596 U.S. at 44. Accordingly, Chapdelaine's bargained-for dismissal does not satisfy the favorable termination element of a malicious prosecution claim.

We do not hold that the dismissal of criminal charges *via* a diversionary program can never constitute a favorable termination for these purposes; rather, we hold only that, on the specific facts of this case, Chapdelaine's conditional dismissal was not a favorable termination. Thus, we affirm the dismissal of Chapdelaine's malicious prosecution claims.

## II.    *Exclusion of Evidence*

Second, Chapdelaine challenges the district court's decision to exclude evidence of Desjardin's apparent suspension, including the underlying internal affairs report.

### A.    *Standard of Review*

We review evidentiary rulings, such as excluding evidence subject to a motion *in limine*, for abuse of discretion, and "we only will reverse where the improper exclusion of evidence affects a substantial right of one of the parties." *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 127 (2d Cir. 2024) (citation modified). "[T]o find such an abuse we must be persuaded that the trial judge ruled in an arbitrary and irrational fashion." *Tereshchenko v. Karimi*, 102 F.4th 111, 124 (2d Cir. 2024) (citation modified).

**B.** *Applicable Law*

Federal Rule of Evidence 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**C.** *Application*

As a threshold matter, Chapdelaine argues on appeal only that the district court erred by not admitting as public records or business records the memorandum noting Desjardin's suspension and the internal affairs report. That argument misses the mark. The district court acknowledged that the documents were likely public records or business records. The district court, however, excluded the memorandum noting Desjardin's suspension and portions of the internal affairs report under Rule 403. On appeal, Chapdelaine does not meaningfully challenge the district court's Rule 403 analysis.

Moreover, we find no abuse of discretion in the district court's Rule 403 analysis. The decision to exclude the evidence was not arbitrary or irrational. Rather, the district court carefully weighed the probative value of the evidence

against the dangers of unfair prejudice and reasonably concluded that the former substantially outweighed the latter and that the evidence presented a risk of misleading the jury. For example, as the district court reasoned, the probative value of any findings that Desjardin violated police regulations, and was apparently suspended for doing so, was outweighed by the possibility of confusing the jury because the police regulations applicable here did not inform the excessive force claims. Thus, we affirm the district court's exclusion of the evidence. *See Qorrolli*, 124 F.4th at 127-28 (noting appellant incorrectly argued error based on business records exception instead of Rule 403 and finding no indication in the record that the district court abused its discretion).

## III. *Judgment as a Matter of Law*

Lastly, Chapdelaine appeals the district court's denial of her post-verdict motion for judgment as a matter of law on her excessive force claims and also asks for the first time that this Court grant judgment as a matter of law on the five other claims submitted to the jury.

### A. *Standard of Review*

"We review a district court's denial of a motion for judgment as a matter of law *de novo*" and apply the same standard as the district court. *Ortiz*,

137 F.4th at 60. We draw all inferences in favor of the non-movant as the prevailing party at trial and "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 61 (citation modified). We may not "weigh credibility or otherwise consider the weight of the evidence," but rather, we "defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Id.* at 61 (citation modified).

### B. *Applicable Law*

#### 1. *Judgment as a Matter of Law*

A Rule 50 motion "may only be granted if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (citation modified).

"A prerequisite for a motion for judgment as a matter of law post-verdict is that the movant had also moved for judgment as a matter of law at the close of all of the evidence." *Id.* (citation modified). Moreover, a party may

only renew a motion for judgment as a matter of law post-verdict on the specific grounds articulated in the pre-verdict motion. *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 164 (2d Cir. 1998). And, on appeal, we may only review the sufficiency of the evidence to support a jury's verdict on a given issue where the party timely moved in the district court for judgment as a matter of law on that issue. *Id.* Thus, where a party fails to make a pre-verdict motion on a claim or a specific issue within a claim, we may only review that claim or issue on sufficiency-of-the-evidence grounds to prevent manifest injustice. *Id.*

**2.** *Excessive Force*

The Fourth Amendment governs a plaintiff's claims that excessive force was used in connection with an arrest. *Mickle v. Morin*, 297 F.3d 114, 120 (2d Cir. 2002). "In this context, the reasonableness question is whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (citation modified). The reasonableness evaluation "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest

or attempting to evade arrest by flight."  *Matusak v. Daminski*, 165 F.4th 702, 713 (2d Cir. 2026) (citation modified).  We must bear in mind, however, that "[n]ot every push or shove" violates the Fourth Amendment, "even if it may later seem unnecessary in the peace of a judge's chambers."  *Calamia v. City of New York*, 879 F.2d 1025, 1034 (2d Cir. 1989) (citation modified); *see also Mickle*, 297 F.3d at 120.

## C.    *Application*

### 1.    *Excessive Force*

We cannot say that, when viewing the facts in the light most favorable to Desjardin and Deojay, "a reasonable jury would not have a legally sufficient evidentiary basis" to rule in their favor.  Fed. R. Civ. P. 50(a)(1).  The jury listened to the 911 call that provided context for the scene Desjardin and Deojay encountered.  The jury also watched the MVR video of events before and after Chapdelaine's arrest.  While some of the critical moments occurred off camera, as the district court noted, this case was "essentially a credibility contest" because the two sides gave starkly different accounts of the arrest.  Dist. Ct. Dkt. 203.  Thus, the jury was tasked with listening to both sides' testimony about what happened during Chapdelaine's off-camera arrest, considering the other relevant evidence described above, and deciding whom to believe.

Ultimately, the jury credited the testimony of Desjardin and Deojay more than that of Chapdelaine, and its decision that Chapdelaine had not proven excessive force was amply supported by the evidence. The jury heard Desjardin and Deojay testify that it was Chapdelaine who "charged" Desjardin -- who knew she had previously threatened others with weapons -- and that Chapdelaine "let herself fall to the ground" and her cries were "theatrical for the cameras." Dist. Ct. Dkt. 208 at 174, 182-83. The jury also heard Desjardin testify that he placed his knee on her right arm at one point only to assist in attempting to gain control of Chapdelaine's left arm as she resisted arrest. The jury heard testimony -- aided by video evidence -- that Chapdelaine's glasses remained on her face during the moments she claims she was thrown to the ground.

Chapdelaine argues that the jury ignored critical trial testimony that demanded a finding in her favor. In doing so, she cites several block quotes of testimony from herself and other witnesses that she contends favor her position. That argument, however, is flawed, for, in reviewing the district court's denial of her motion for judgment as a matter of law, we must disregard all evidence favoring Chapdelaine that the jury was not required to believe -- including any trial testimony favorable to her. *See Mickle*, 297 F.3d at 121. Thus, we evaluate

whether a reasonable jury could find for Desjardin and Deojay considering only the testimony favoring their side of the story and any indisputable evidence, such as the MVR video and 911 call. We conclude that a reasonable jury could find for Desjardin and Deojay when considering this evidence.

Accordingly, we affirm the district court's denial of Chapdelaine's motion for judgment as a matter of law on her excessive force claims.[8]

### 2. *Waived Arguments*

Before the jury reached its verdict, both parties moved for judgment as a matter of law. Chapdelaine, however, moved only with respect to her excessive force claims. The district court explicitly asked Chapdelaine if she wished to move for judgment on any other claims, and she responded, "No, Your Honor, that was . . . the one." Dist. Ct. Dkt. 211 at 167. Nonetheless, Chapdelaine now asks this Court to grant her judgment as a matter of law on the claims she failed to preserve before the district court. We decline this invitation.

---

[8] A claim for failure to intervene in the use of excessive force cannot survive a jury's finding of no excessive force. *See Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *Addona v. D'Andrea*, No. 14-CV-1757, 2016 WL 5107054, at *3 (D. Conn. Sept. 19, 2016), *aff'd*, 692 F. App'x 76 (2d Cir. 2017); *cf. Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (noting officers have a duty to intervene during the violation of a party's constitutional right by another officer). Thus, to the extent Chapdelaine argues Deojay failed to intervene during her interaction with Desjardin, we reject that argument in light of our decision to uphold the jury's verdict that there was no excessive force.

As noted above, on appeal from the denial of a motion for judgment as a matter of law, we will only review claims properly raised before the district court save for manifest injustice. *Kirsch*, 148 F.3d at 164. Chapdelaine failed to raise any claims in her Rule 50(b) motion before the district court other than her excessive force claims. Consequently, Chapdelaine has waived any argument that this Court should grant judgment as a matter of law on her remaining claims. *Id.* Moreover, we see no clear manifest injustice in the jury's verdict on those claims. *See id.*

## *CONCLUSION*

For the reasons discussed above, the district court's decisions are AFFIRMED.